IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 06-cv-01428-MSK-MEH

WILLIAM DIAL,

       Plaintiff,

v.

R. WILEY, Warden,

       Defendant.

_____

# OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
_____

**THIS MATTER** comes before the Court pursuant to the Defendant's Motion to Dismiss **(# 23)**, and the Plaintiff's response **(# 30, 31)**; the Defendant's Motion for Summary Judgment **(#46)**, and the Plaintiff's response **(# 50)**, and the Defendant's reply **(# 52)**; the Defendant's Motion to Seal **(# 47)**, and the Plaintiff's response **(# 50)**, and the Defendant's reply **(# 53)**; the Plaintiff's Motion for Sanctions **(# 54)**, the Defendant's response **(# 55)**, and the Plaintiff's reply **(# 57)**; the Plaintiff's Motion to Stay **(# 56)**, which the Court construes as an application pursuant to Fed. R. Civ. P. 56(f), and the Defendant's response **(# 61)**; and the Plaintiff's Motion "for Court's Intervention" **(# 58)**, to which the time for responding under D.C. Colo. L. Civ. R. 7.1(C) has not yet run.[1]

---

[1] The record also contains a pending motion by the Plaintiff to amend the "record" to include a copy of a book cover **(# 51)**. The Plaintiff has previously sought **(# 27)** and obtained **(# 33)** that relief, and thus, the pending motion to amend is denied as moot.

## FACTS

According to the Complaint **(# 3)**, the Plaintiff is an inmate of the Federal Bureau of Prisons ("BOP") at the United States Penitentiary, Administrative Maximum ("ADX") in Florence, Colorado.  In or about September 2005, the Plaintiff ordered a copy of a book entitled "The 48 Laws of Power" ("the Book") from an entity outside the prison.  The Book arrived at the prison mailroom in September 2005, but the prison staff recommended to the Defendant, the Warden of ADX, that the Book be disallowed to the Plaintiff.  On September 2, 2005, the Defendant notified the Plaintiff that the Book was being rejected because "it contains information about the manipulation and controlling of people.  This information has been determined to be detrimental to the security, good order and discipline of the institution."   Attached to the Plaintiff's Complaint is a statement by the Plaintiff that he has spoken to several other inmates who claim to possess copies of the Book.

The Plaintiff alleges two *Bivens* claims: (i) that denial of the Book violates his First Amendment rights; and (ii) that the denial of the Book and the Plaintiff's subsequent requests for clarification of the Bureau of Prisons' policies on the issue deprive him of a liberty interest in violation of the Fifth and Fourteenth Amendments.  The Plaintiff seeks declaratory and injunctive relief permitting him to have a copy of the Book, as well as monetary damages.

The Defendant moved to dismiss **(# 23)** the Plaintiff's Complaint, alleging that the Plaintiff had failed to exhaust his administrative remedies.  Specifically, the Defendant alleged that the Plaintiff's Step 4 grievance to the BOP's Central Office was untimely by more than a month.  28 C.F.R. § 542.15(a) (Step 4 appeal must be filed within 30 days of Step 3 denial.)

Thereafter, the Defendant moved for summary judgment **(# 46)**, contending that: (i) under the *Turner v. Safley*, 532 U.S. 223, 226 (2001), analysis, the Defendant was permitted to withhold the Book out of prison security concerns, and that the Plaintiff had adequate alternative means of exercising his right to obtain reading materials; and (ii) that, as to any Due Process claim, the Plaintiff cannot show that he was deprived of a liberty interest because the deprivation of the Book did not impose an atypical or significant hardship upon him. The Plaintiff filed a response **(# 50)** that: (i) states that the Plaintiff previously possessed a copy of the Book; (ii) agrees that the Book includes guidance as to how to manipulate and control others; but (iii) states that the Plaintiff already possesses some excerpts from the Book, and has been permitted to retain those excerpts despite subsequent "shakedowns" of his cell.  In addition, the Plaintiff argues that the alleged security concerns are overstated, because he has already read the Book and has not used the knowledge gained therefrom for improper purposes.

There are several additional motions pending which will be discussed more fully below.

## ANALYSIS

**A. Standard of review**

In light of the Plaintiff's *pro se* status, the Court has construed all of his pleadings liberally. *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir.1991).  In other words, if the Court if can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so despite the plaintiff's failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements. *Hall*, 935 F.2d at 1110.  However, the requirement that the Court read the plaintiff's pleadings broadly does not relieve the plaintiff

of the burden of alleging sufficient facts on which a recognized legal claim could be based. *Id.* Moreover, *pro se* status does not relieve the Plaintiff from the duty to comply with the various rules and procedures governing litigants and counsel or the requirements of the substantive law. *See McNeil v. U.S.*, 508 U.S. 106, 113 (1993); *Ogden v. San Juan County*, 32 F.3d 452, 455 (10th Cir. 1994).

### B. Motion to Dismiss

The Defendant moves to dismiss the Plaintiff's Complaint for failure to exhaust administrative remedies. The failure to exhaust is an affirmative defense upon which the Defendant bears the initial burden of showing that the Plaintiff's claims were not properly exhausted. *Jones v. Bock*, 127 S.Ct. 910, 921 (2007). Here, the Defendant has done so by showing that the Plaintiff's Step 4 appeal was untimely.

The BOP maintains a four-step administrative remedy program by which inmates aggrieved by the action or policies of the BOP may seek administrative redress. 28 C.F.R. § 542.10 *et seq.* In Step 1, the inmate must attempt informal resolution with the appropriate staff member. 28 C.F.R. § 542.13. If the problem is not resolved, the inmate must proceed to Step 2 by filing an Administrative Remedy Request (form BP-9) within 20 calendar days of the event giving rise to the grievance. 28 C.F.R. § 542.14. If the Step 2 grievance is denied, the inmate may file an appeal to the Regional Director (form BP-10) within 20 days of the denial of the Step 2 request. 28 C.F.R. § 542.15(a). If the Regional Director denies the appeal, the inmate has 30 days from the denial to file an appeal to the General Counsel (form BP-11). 28 C.F.R. § 542.15(a). The appeal to the General Counsel is the final administrative stage and, upon its completion, the administrative procedure is exhausted.

According to the exhibits attached to the Complaint, the Plaintiff timely proceeded through the first three steps of the process, with his Step 3 grievance being denied on December 23, 2005. Thus, the Plaintiff's Step 4 grievance was due on January 22, 2006, 30 days from December 23, 2005. However, the Plaintiff actually signed his Step 4 grievance on March 2, 2006, approximately six weeks late. The BOP rejected the Plaintiff's Step 4 appeal as untimely, as well as for other procedural violations, but instructed the Plaintiff that if he could show that the grievance was rendered untimely by circumstances outside of his control, he could refile it. On or about April 5, 2006, the Plaintiff refiled the Step 4 appeal, although the record does not reflect that the re-filed BP-11 gave any indication that the prior filing was untimely for reasons beyond the Plaintiff's control. Nevertheless, on May 16, 2006, the BOP denied the Plaintiff's re-filed Step 4 grievance on the merits.

From the foregoing, the Defendant has made a *prima facie* showing that the Plaintiff failed to adequately exhaust his administrative remedies. Thus, the burden shifts to the Plaintiff to come forward with evidence showing that exhaustion was proper. The Plaintiff's response to the Defendant's motion explains that the Plaintiff cannot submit BP-9, -10, or -11 forms directly, and that he must rely upon ADX staff to assist him. The response makes reference to "the letter written by Mrs. Tina Sudlow, which explains that the untimely filing was not due to my negligence." *Docket* # 31 at 2. The Plaintiff argues that this letter – which the Court has not found anywhere in the record – must have been satisfactory to the BOP, as it proceeded to resolve the Plaintiff's Step 4 appeal on the merits.

Under the circumstances, the Court will assume that the Plaintiff has met his burden of coming forth with facts showing that his late Step 4 appeal was nevertheless sufficient to exhaust

his administrative remedies. The absence of the Sudlow letter from the record is troubling, but the Court notes that the Defendant has not replied to the Plaintiff's response, disputing that the Sudlow letter exists nor arguing that the letter is insufficient to render the Plaintiff's refiled Step 4 appeal timely. Moreover, the Court is persuaded that the General Counsel's evaluation of the refiled Step 4 appeal on its merits contrasts notably with the initial rejection of the appeal as untimely. The Court can logically infer that, had the refiled appeal not adequately demonstrated an excuse for its untimeliness, the BOP would not have considered it on the merits. Accordingly, the Court denies the Defendant's motion to dismiss.

### C. Motion for summary judgment

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, the claim or defense must be dismissed as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Here, all of the relevant facts discussed below are undisputed. Thus, the Court need only apply the relevant law to those facts to determine which party is entitled to judgment.[2]  *See* Wright & Miller, FEDERAL PRACTICE & PROCEDURE, § 2720.

---

[2]The Plaintiff has filed a Motion to Stay **(# 56)** the Court's adjudication of the Defendant's summary judgment motion pending the Plaintiff's obtaining of additional discovery. The Court construes that motion as one pursuant to Fed. R. Civ. P. 56(f). The Court should grant relief under Rule 56(f) liberally. *Jensen v. Redevelopment Agency of Sandy City*, 998 F.2d 1550, 1554-55 (10th Cir. 1993). However, the mere assertion by the non-movant that more discovery is needed is insufficient to properly invoke Rule 56(f). By its own terms, a request under Rule 56(f) must be made by an affidavit, stating reasons why the party is unable to present facts to oppose summary judgment. That affidavit must do more than simply allege that discovery has not been completed, or that specific facts are unavailable to the affiant. *Id.* at 1555. Rather, the affiant must show how the additional time requested will enable him to rebut the movant's allegations that no issue of fact exists. *Id.*  To do so, the affiant should identify the specific facts sought to be obtained and what steps the affiant has already made to obtain them. *Committee for the First Amendment v. Campbell*, 962 F.2d 1517, 1522 (10th Cir.1992).

Here, even if the Court were to liberally construe the Plaintiff's motion as a Rule 56(f) affidavit, the Plaintiff has not identified the specific facts he seeks to discover, nor shown that he has taken reasonable steps to discover them. The Plaintiff states that he seeks to discover evidence that the BOP "allowed other inmates to receive and keep the same book, [and that] the BOP allowed inmates to have access to books that possess much more security risks[s]," among other things. The Plaintiff's speculation that it can locate such generalized evidence is insufficient to entitle him to relief under Rule 56(f). Moreover, the Plaintiff has already come forward with evidence for the proposition that other inmates have had access to the Book, and proof of other books posing what the Plaintiff believes to be security risks would not be probative here. Accordingly, the Plaintiff's Motion to Stay is denied.

The Defendant withheld the Book from the Plaintiff pursuant to BOP Program Statement 5266.10. That policy provides that the Warden of a facility may reject a book or publication ordered by an inmate if that book or publication is "determined detrimental to the security, good order, or discipline of the institution." *See also* 28 C.F.R. § 540.71. When evaluating whether a Warden's rejection of a publication pursuant to this standard violates the First Amendment, the Court applies the *Turner* analysis. *Thornburgh v. Abbot*, 490 U.S. 401, 413 (1989). Under *Turner,* the Defendant's action is valid, even if it does infringe upon the Plaintiff's First Amendment rights, if it is "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. To make a determination of reasonableness, the Court examines four factors: (i) whether there is a valid, rational connection between the regulation and the governmental interest put forth to justify it; (ii) whether there are alternative means for the inmate to exercise the right that is otherwise infringed; (iii) the impact that accommodating the asserted right would have on prison staff and other inmates; and (iv) whether there is a ready alternative that fully accommodates the inmate's rights at *de minimis* cost. *Id.* at 89-91.

The first *Turner* factor examines the closeness of the fit between the challenged action and the Defendant's proffered penological interest – namely, maintaining prison security. The Supreme Court in *Thornburgh* found, on similar facts, that regulations similar to those at issue here were, on their face, closely connected to prison security concerns. As to the Book at issue here, the Court finds that the undisputed evidence is that part of the Book explains how to control and manipulate other people. The preface of the Book alone makes this clear:

> Everything must appear civilized, decent, democratic, and fair. But
> if we play be those rules too strictly, if we take them too literally,
> we are crushed by those around us who are not so foolish. . .

8

> Outwardly, you must seem to respect the niceties, but inwardly, unless you are a fool, you learn quickly to . . . master the arts of indirection . . . You will be able to make people bend to your will without their realizing what you have done. And if they do not realize what you have done, they will neither resent nor resist you.

*Docket* # 48 at 11-12. The Plaintiff admitted at his deposition that many of the "laws of power" discussed in the Book – *e.g.* techniques for deceiving, manipulating, and intimidating other people – reflect behaviors that prison administrators would be reasonable in seeking to prevent. *Docket* # 46-2 at 14-15. It requires no great leap of reason to assume that the Defendant's belief that the Book would pose a threat to the security of ADX was reasonable.

The Plaintiff's primary defense seems to be that any purported security concerns are rendered hollow by the fact that other prisoners at ADX have copies of the Book, and that the Plaintiff himself has been permitted to retain "excerpts" of the Book. On the surface, there is some appeal in the notion that, if security concerns posed by the Book are so significant, the Defendant should be vigilant in attempting to eradicate it wherever it may be found at ADX. However, the Supreme Court in *Thornburgh* addressed this precise issue, stating that the fact that the applicable regulations and policies permit prison officials to exercise discretion in deciding what publications may be received by inmates, "inconsistencies" may result. 490 U.S. at 417 n. 15. The Court was not troubled by these inconsistencies, however, observing that

> what may appear to be inconsistent results are not necessarily signs of arbitrariness or irrationality. Given the likely variability within . . . institutions over time, greater consistency might be attainable only at the cost of a more broadly restrictive rule against admission of incoming publications. Any attempt to achieve greater consistency by broader exclusions might itself run afoul of the second *Turner* factor.

*Id.*

Given the size of an institution like ADX, the number of staff members involved, and the numerous vectors by which publications (or indeed, any type of contraband) can enter the facility (*e.g.* through the mailroom, as the property of an inmate transferred to the facility, as the possessions of employees or visitors, smuggled in, etc.), it is not surprising that some copies of the Book might find their way into the prison notwithstanding the Defendant's belief that its presence poses a security risk. Moreover, it is entirely plausible that the copies of the book entered the prison prior to the Defendant's tenure as Warden, arriving during the regime of a less-cautious Warden.

The fact that inmates are apparently permitted to continue to possess copies of the Book also does not compel the conclusion that the Defendant's action here is unreasonable. As is often the case with contraband, it is not surprising that the Plaintiff is more aware of other inmates' possession of prohibited items than are prison officials. The Plaintiff has come forward with no evidence or allegations that the Defendant was aware of other inmates' possession of the copies of the Book, nor produced facts that would suggest that the Defendant consented to such continued possession. The Plaintiff does allege that his own copies of "excerpts" of the book were not confiscated during a shakedown of his cell in 2007, but this fact alone proves little. The Plaintiff has not shown that the officials searching his cell were looking for contraband in the form of inappropriate written materials; that they took the time to review the excerpts from the Book; or that the excerpts at issue are significant enough to warrant concern. Moreover, the Plaintiff lists the persons involved in conducting the shakedown, and the Defendant was not among them.

Even if all of these facts were present, however, they do not compel the conclusion that the Defendant's actions here are unreasonable. The regulation and policy at issue here concerns

itself solely with publications at the time they enter the prison, and repose sole discretion in the Warden to make the determination as to whether a publication should enter or not. As the *Thornburgh* footnote quoted above explains, different prison officials may have differing opinions as to whether a certain publication warrants exclusion. Interestingly, under the terms of the regulation, the Defendant is <u>prohibited</u> from maintaining a list of excluded publications. *Thornburgh*, 490 U.S. at 417, *citing* 28 C.F.R. § 540.71(c). Without a comprehensive list of "banned books" to guide other prison officials in confiscating contraband, it is entirely possible that officials conducting the shakedown are unaware of, or even disagree with, the Warden's conclusions as to what books pose security risks. In such circumstances, the Plaintiff might be able to retain excerpts (or indeed, entire copies) of the Book for considerable periods of time, despite the Defendant's concerns as to the risks it poses. In sum, the effect of the regulation is to allow the Warden one opportunity to stop offending publications at the mailroom door; once those publications enter the facility, the Warden's ability to control them is, in practice, much more limited. The fact that some others have been successful in sneaking copies of the Book past this single stage of screening does not establish that the Defendant's decision in this instance was unreasonable.

The second *Turner* factor examines whether there are alternative means by which the inmate can exercise the affected right. The Supreme Court in *Thornburgh*, considering the same regulations limiting inmate access to certain publications, found that this factor was evaluated by examining whether the regulations still permit "a broad range of publications" to be obtainable by the inmate. 490 U.S. at 417-18. There is no dispute here that the Plaintiff has access to an

expansive prison library, as well as the opportunity to order most types of books from outside vendors. Thus, this factor tips in favor of a finding of reasonableness.

The third *Turner* factor examines the impact that permitting the inmate to possess the specific publication would have on other inmates and prison staff. In *Thornburgh*, the Court noted that "the class of publications to be excluded is limited to those found potentially detrimental to order and security; the likelihood that such material will circulate within the prison raises the prospect of precisely the kind of 'ripple effect' with which the Court in *Turner* was concerned." *Id.* at 418. The same logic applies here – although the Plaintiff himself denies having any unsavory motivations for wanting to consider the Book's lessons,[3] it is undisputed that books – and indeed, this Book – have the ability to circulate surreptitiously within the prison, perhaps coming into the hands of other inmates whose motivations are not as benign.

Finally, the fourth *Turner* factor inquires whether there is some alternative means by which the Plaintiff can fully exercise the right he seeks to enjoy. The Plaintiff does not allege, and the Court can conceive of no alternative, that would permit him to receive the Book without violating some prison policy.[4]

Accordingly, the Court finds that all four *Turner* factors point in favor of a conclusion that the Defendant's decision here to prohibit the Plaintiff's receipt of the Book was reasonably related

---

[3]In his deposition, the Plaintiff insisted that he was only interested in the Book for its discussions regarding historical figures and the means by which they accomplished their feats.

[4]The Plaintiff admits in his deposition that inmates are not permitted to share items with each other. *Docket* # 46-2 at 9 ("Q: And is there any rule against that, if somebody wants to borrow a book from [someone else?]  A: – you're not supposed to pass stuff back and forth, but – we'll just leave it at that.") Thus, borrowing a copy of the Book from another inmate with a copy would violate prison rules.

to legitimate penological interests. The Defendant is therefore entitled to summary judgment on the Plaintiff's First Amendment claim.

To the extent the Plaintiff alleges that the denial of the Book deprives him of a liberty interest without Due Process, the analysis is much simpler. To establish a protectible liberty interest in the prison context, the Plaintiff must show that the denial of receipt of the Book constitutes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."[5] *See e.g. Wilkinson v. Austin*, 545 U.S. 209, 223 (2005). The Plaintiff readily admits that prison officials sometimes invoke the policy to withhold books and other publications from inmates, and thus, it cannot be said that the withholding of the Book here constitutes an "atypical" incident of prison life. Moreover, the withholding of a single book, while a wealth of other titles are available to the Plaintiff from both within and without the prison, cannot be considered a significant hardship in the prison context. Accordingly, the Defendant is entitled to summary judgment on the Plaintiff's Due Process claim as well.

### D. Motion to Seal

The Defendant submitted an approximately 30-page excerpt from the Book in conjunction with his summary judgment motion, allowing the Court to obtain an understanding of the contents and purpose of the book. The Defendant moves **(# 47)** to keep that submission sealed to prevent the Plaintiff from accessing it.

---

[5]In the alternative, the Plaintiff could show that the regulation or policy itself expressly confers specific rights reflected in mandatory language. *See e.g. Abott v. McCotter*, 13 F.3d 1439, 1443 (10th Cir, 1994) (confiscation of inmate's only book in apparent violation of regulation specifically entitled inmate "shall" be allowed to possess up to ten books implicated potential liberty interest). Nothing in the regulation or Program Statement herein contains language giving rise to a property interest under the circumstances here.

The Supreme Court acknowledged a common-law right of access to judicial records in *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 597 (1978).  This right is premised upon the recognition that public monitoring of the courts fosters important values such as respect for the legal system.  *See In re Providence Journal Co.*, 293 F.3d 1, 9 (1st Cir. 2002).  Judges have a responsibility to avoid secrecy in court proceedings because "secret court proceedings are anathema to a free society."  *M.M. v. Zavaras*, 939 F. Supp. 799, 801 (D. Colo. 1996) (J. Kane).  It is critical that the public be able to review the factual basis of this Court's decisions and evaluate the Court's rationale so that it may be confident that the Court is functioning as a neutral arbiter.  *Cf. United States v. McVeigh*, 119 F.3d 806, 814 (10th Cir. 1997).

Normally, documents are sealed to prevent the <u>public</u> from gaining access to their contents – an action that implicates the public's interest in monitoring the performance of the Court.  Here, however, sealing is sought only to prevent the Plaintiff, not the public, from obtaining access to the excerpt from the Book.  Presumably, the Defendant has no objection to members of the public reviewing it.  Although sealing will have the incidental effect of preventing the public from reviewing the particular excerpt considered by the Court, nothing prevents the public from obtaining a copy of the Book from any library or bookstore, and reviewing the Table of Contents, the Preface, pages 1-7, 29, 123, 126-128, 204, and 206, along with the back cover.  This is the entirety of the excerpt that is before the Court.

The Plaintiff opposes sealing.  He admits that "an inmate should not be able to obtain the objectionable portions of a book simply by filing a civil action," but contends that because he has already been allowed to read the Book previously, and because he is in possession of certain

excerpts from the Book, there is no reason why he should not be entitled to see the excerpts supplied by the Defendant.

The Plaintiff's position is illogical. To the extent the Plaintiff has this content in his own excerpts, or to the extent he remembers the contents from his prior reading of the Book, he need not see the portions submitted to the Court. There is no due process problem. To the extent the submitted material is new to him, the Court has already determined from its *in camera* review, that it revealing such content may pose a security risk. Accordingly, the Defendant's motion to seal is granted.

### E. Remaining matters

The Plaintiff moves for sanctions **(# 54)** against the Defendant, alleging that the Defendant's representation to the Court that the Book is prohibited in the prison is perjurous. In support of this contention, the Plaintiff points out that he has twice obtained copies of the Book from other sources inside ADX. The Court rejects the Plaintiff's request. At no time has the Defendant represented to the Court that the Book cannot be obtained within ADX; he has merely represented to the Court that he withheld the particular copy ordered by the Plaintiff on security concerns. For the reasons discussed above, the fact that the Defendant seized the Book at the time of its entry into the prison has little connection to the fact that copies and excerpts from the Book can nevertheless be found within the facility. Because the Plaintiff has shown no specific perjurous statement by the Defendant, his motion is denied.

The Plaintiff also moves for nonspecific "intervention" **(# 58)** by the Court to halt certain alleged "retaliation" against him by the Defendant and ADX staff. Because the Court grants summary judgment on the substantive issues in this case, the unrelated allegations of retaliation

are beyond the scope of this action. To the extent the Plaintiff believes that such conduct is violative of his constitutional rights, he may invoke the appropriate processes to seek redress for those actions. The motion for "intervention" is denied.

## CONCLUSION

For the foregoing reasons, the Defendant's Motion to Dismiss **(# 23)** is **DENIED**. The Defendant's Motion for Summary Judgment **(# 46)** is **GRANTED**, and judgment shall enter in favor of the Defendant on all claims simultaneously with this Order. The Defendant's Motion to Seal **(# 47)** is **GRANTED**, and Docket # 48 shall remain **SEALED**. The Plaintiff's Motion to Amend the Record **(# 51)** is **DENIED AS MOOT**. The Plaintiff's Motion for Sanctions **(# 54)** is **DENIED**. The Plaintiff's Motion to Stay **(# 56)**, which the Court construes as an application pursuant to Fed. R. Civ. P. 56(f), is **DENIED**. The Plaintiff's Motion "for Court's Intervention" **(# 58)** is **DENIED**.

Dated this 17th day of September, 2007

                                            **BY THE COURT:**

                                            Marcia S. Krieger
                                            United States District Judge